GRIFFIS, P.J.,
for the Court:
¶ 1. This appeal contests the validity of the last will and testament of Lorraine H. Thomas. Richard Glenn Thomas was the proponent of the will and filed a petition to probate the will. Ernest Thomas Jr. and Linda Thomas were the contestants of the will. The chancellor dismissed the will contest filed by Ernest and Linda and declared the will to be valid. In this appeal, Ernest and Linda argue that the chancellor erred when she found both that the will was valid and that the will was not the product of undue influence.
FACTS
¶ 2. On January 15, 1997, at the age of seventy-three, Lorraine died as a result of injuries sustained from a ear accident. She was survived by three adult children: Glenn, Ernest, and Linda.
¶ 3. Lorraine lived most of her life in Yazoo City, Mississippi, under the primary care of Ernest. In January 1993, Lorraine moved to Freeport, Florida. In Florida, Lorraine was under the primary care of Glenn, but she lived with various caretakers.
¶ 4. Lorraine suffered from chronic alcoholism, cirrhosis of the liver, irregular heartbeats, depression, seizures, and Graves Disease. Lorraine required care from Glenn and other caregivers, as she did with Ernest, to cook and clean for her, take her to doctor’s appointments, and administer her medication.
¶ 5. On August 29, 1993, Lorraine purportedly executed her will. At the suggestion of Glenn, Lorraine consulted with Bea Roper to draft her will. Although Roper was a stranger to Lorraine, Glenn knew Roper and admitted they were friends through his work at Sears. Roper was not an attorney and was not paid to prepare the will. Glenn was present when Lorraine and Roper met to discuss the will, which took place in a large room where Glenn was on one side and Lorraine and Roper were on the other side.
*114 ¶ 6. Roper drafted a will for Lorraine, which appears to be a form will. It contains several blanks that were to be filled in. For example, at the top of the will, it states “Last Will and Testament of _” “Lorraine H. Thomas” is handwritten in the blank. At the trial, Glenn identified this as his handwriting. In original form, the second and third paragraphs read:
SECOND
I give, devise and bequeath all of my property, whether the same be real or personal, or mixed, of which I die seized or possessed, or to which I may be entitled at my death, and wheresoever the same may be situated, including, without limitation, all property acquired by me after the execution of this will to my children, _ _ in equal shares, [to] share and share alike, provided they survive me, per stirpes. To my son _I give and devise one dollar ($1.00) in legal tender, this sum and no more, along with my love and prayers.
THIRD
I hereby nominate and appoint my son, _, personal [representative of my estate, to serve without bond of any kind. Should he be unable or unwilling to serve [or] to continue to serve in that capacity, then I appoint _to serve without bond of any kind.
¶ 7. The will included handwritten names in each of these blanks. The handwriting was Glenn’s, not Lorraine’s. In the second paragraph, the names “Glenn Thomas” and “Linda Thomas” were written in the first two blanks. A line was drawn through the third blank. Thus, the will purports to leave all of Lorraine’s property to Glenn and Linda. In the blank that disinherited her son, the name “Ernest Thomas Jr.” was written in the blank. In the third paragraph, the name “Glenn Thomas” was written in the blank to appoint him the personal representative, and the name “Linda Thomas” was written to name her the successor representative. As a result, the purported will left Lorraine’s estate to Glenn and Linda, to share equally, and disinherited Ernest. Lorraine did not initial either paragraph where these blanks were filled in by Glenn. Glenn testified that he wrote in the names as Lorraine requested.
¶ 8. Roper was not involved in the execution of the will. Instead, Glenn and his daughter drove Lorraine to City Drugs, a pharmacy in Niceville, Florida, where she executed the will. Glenn testified that they went to City Drugs because a sign in the window indicated that a notary public was available inside. Glenn accompanied Lorraine inside. There, Doug Livingston and Karen Evans signed the will as subscribing witnesses. Livingston and Evans also signed an affidavit that stated Lorraine was of sound and disposing mind at the time the will was executed. Glenn testified that the will was signed on a Sunday, August 29, 1993, but did not testify as to why the will was signed on a Sunday.
¶ 9. Although Glenn testified that Livingston was believed to be a notary public, a notary seal does not appear upon the will. Glenn testified that he paid Livingston a notary fee and that he believed that Livingston notarized the will. Glenn also testified that Livingston asked to see Lorraine’s identification and reviewed the will before it was executed on the pharmacy counter at the back of the store.
*? ¶ 10. Lorraine signed the will in the blank just below the execution clause, which stated “IN WITNESS WHEREOF, I have hereunto set my hand and placed my initials in the margins of the preceding two pages, in the presence of two (2) witnesses, and declare this instrument to be my Last Will and Testament....” However, Lorraine’s initials do not appear anywhere on the first two pages of the will. Glenn could not provide an explanation as to the absence of Lorraine’s initials from the first two pages of the will.
¶ 11. While Lorraine lived in Florida, due to her poor physical health, Glenn was solely responsible for handling her finances and real estate interests. Glenn also made all of the medical decisions for Lorraine and provided her transportation.
¶ 12. In fact, on December 30, 1992, before she moved to Florida, Lorraine executed a power of attorney in favor of Glenn. On the authority of the poweh of attorney, Glenn closed all of Lorraine’s Mississippi accounts with the exception of one account at the Bank of Yazoo City. Lorraine’s social security checks were mailed to Glenn’s residence in Florida and deposited into Glenn’s personal checking account. Glenn used monthly income from Lorraine’s rental property, which was directly deposited into her checking account at the Bank of Yazoo City. Glenn paid all of Lorraine’s bills, signed all checks written on her account, and paid all of her debts. When Lorraine moved to Florida, she had significant debt. By the time she died, however, Glenn had paid all of her creditors and left a balance of $2,000 in account at the Bank of Yazoo City.
PROCEDURAL HISTORY
¶ 13. On February 19, 1997, after Lorraine’s death, Glenn admitted her will to probate in the Circuit Court of Walton County, Florida. The will was admitted as part of a wrongful-death lawsuit that had been filed in connection with Lorraine’s car accident. There was no further action or pleadings filed after the petition was filed and letters of administration were issued.
¶ 14. On July 25, 1997, Glenn filed a petition for probate of Lorraine’s will and for letters testamentary in the Chancery Court of Yazoo County, Mississippi. On July 30, 1997, the chancellor entered an order that admitted the will to probate and granted letters testamentary. Beginning September 17; 1997, the notice to creditors was published in The Yazoo Herald for three consecutive weeks.
¶ 15. On November 6, 1997, Ernest and Linda filed a petition to contest the validity of the will, which included a claim' of undue influence.
¶ 16. On December 18,1997, Glenn filed a $16,000 claim against the estate. Glenn’s claim did not include any supporting documentation or invoices to verify his claim.
¶ 17. On December 31, 1997, BankPlus filed a claim for $25,000 against the estate. BankPlus’s claim was based on a promissory note and deed of trust that had been executed by Glenn and Lorraine. The loan proceeds were used as a down payment on a house in Florida for Glenn.
¶ 18. Ernest and Linda filed an objection to the payment of the probated claims. They alleged that the claims were untimely filed. The chancellor entered an order that acknowledged the voluntary withdrawal of BankPlus’s claim and disallowed Glenn’s claim.
¶ 19. On May 27, 1999, Ernest and Linda filed a motion to remove Glenn as the executor. Ernest and Linda cited Glenn’s failure to file an annual accounting and inventory of the estate, and his attempt to lease real property of the estate without authorization from the court. Glenn then filed an annual accounting on July 29,1999. Ernest and Linda amended *116 their motion and alleged that Glenn spent estate funds without approval from the court in violation of his fiduciary duty owed to the estate. By order dated October 11, 1999, the chancellor denied the motion to remove Glenn as executor.
¶ 20. On October 21, 1999, Ernest and Linda filed another motion to remove Glenn as the executor. Ernest and Linda cited Glenn’s failure once again to file an annual accounting and inventory, and his attempt to encumber real property of the estate without the court’s authority. By order dated November 16, 1999, the chancellor removed Glenn as executor. By order dated August 11, 2000, Ernest was appointed as executor of the estate.
¶ 21. A hearing was held on October 26, 2010, and May 31, 2011. On October 14, 2011, the chancellor issued an “Opinion and Order on Will Contest,” where she found Lorraine’s will to be valid and dismissed the will contest action. It is from this judgment that Ernest and Linda now appeal.
STANDARD OF REVIEW
¶ 22. “A [chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard.” In re Estate of Grantham,, 609 So.2d 1220, 1223 (Miss.1992) (citations omitted). Reversal is not warranted by this Court if the chancellor’s findings are supported by substantial credible evidence. In re Estate of Grubbs, 753 So.2d 1043, 1046 (¶ 7) (Miss.2000) (citations omitted).
ANALYSIS

I. Whether the chancellor erred when she found the will was valid, pursuant to Mississippi Code Annotated section 91-5-1.

¶ 23. Ernest and Linda argue that Lorraine’s will was not valid, under Mississippi Code Annotated section 91-5-1 (Rev. 2004), because the will required that Lorraine affix her initials in the margins of the first two pages of the four-page will. They argue that, since Lorraine’s initials do not appear on the first two pages, the will is not valid.
¶ 24. Section 91-5-1 provides:
Every person eighteen (18) years of age or older, being of sound and disposing mind, shall have power, by last will and testament, or codicil in writing, to devise all the estate, right, title and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have, of, in, or to lands, tenements, hereditaments, or annuities, or rents charged upon or issuing out of them, or goods and chattels, and personal estate of any description whatever, provided such last will and testament, or codicil, be signed by the testator or testatrix, or by some other person in his or her presence and by his or her express direction. Moreover, if not wholly written and subscribed by himself or herself, it shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix.
¶ 25. Ernest and Linda argue that the will established the requirements for Lorraine’s proper execution of the will, where it states:
IN WITNESS WHEREOF, I have hereunto set my hand and placed my initials in the margins of the preceding two pages, in the presence of two (2) witnesses, and declare this instrument to be my Last Will and Testament on this the 29th day of August, 1993.
This provision clearly states that Lorraine signed the will and “placed my initials in the margins of the preceding two pages.” *? Despite this language, Lorraine’s initials do not appear on the first two pages of the will.
¶ 26. Glenn admitted that the first two pages of the will did not contain Lorraine’s initials or her handwriting. In fact, the first two pages only contained Glenn’s handwriting. While Glenn testified that he completed the will based on Lorraine’s instructions, there was no testimony from a disinterested third party or any evidence to corroborate his assertion. After Lorraine executed the will, Glenn took possession of the will and placed it in his safe-deposit box. Lorraine did not have access to that safe-deposit box.
¶ 27. Ernest and Linda argue that Lorraine’s signature did not comply with the statutory formalities and the express terms of the will. They also contend that it can be inferred from the evidence that the only explanation for the absence of Lorraine’s initials from the first two pages of the will was that those pages were not the first two pages attached to the will when Lorraine signed it.
¶ 28. In In re Estate of Taylor, 755 So.2d 1284, 1287 (¶ 12) (Miss.Ct.App.2000) (citations omitted), this Court held:
It is well settled law in Mississippi that in a will contest the proponents of the will have the burden of persuasion on all issues requisite to the validity of a will, e.g., due execution and testamentary capacity. Showing that the will was properly probated makes out the proponent’s prima facie case. At this point, the burden of production shifts to the contestants. The contestants must present evidence to support their contention that the will is not valid. If the contestants present no evidence, the proponent’s pri-ma facie case stands, and the will will be found to be valid. Furthermore, the contestants may raise other issues, such as undue influence, but like the other grounds for invalidity, if the contestants do not present evidence to support the contention, the will may not be found invalid.
¶29. Ernest and Linda argue that the evidence presented at trial by Glenn failed to meet his burden to establish the validity of the signatures on the will. They argue that what constitutes a sufficient signature to a will depends largely on the circumstances of each particular case. Here, the will itself specified the places where the signature, and marginal initials, should have been affixed to evidence Lorraine’s intent.
As a general rule of law, courts tend to sustain a testamentary document as having been legally executed if it is possible to do so consistent with statutory requirements. Ordinarily, substantial compliance with statutory formalities in the execution of a will is sufficient, in the absence of a suggestion of fraud, deception, undue influence or mental incapacity-
In re Estate of Giles, 228 So.2d 594, 596 (Miss.1969) (citation omitted).
¶ 30. For a non-holographic will to be validly executed, it must “be signed by the ... testatrix.... Moreover, if not wholly written and subscribed by ... herself, it shall be attested by two (2) or more credible witnesses in the presence of the ... testatrix.” Miss.Code Ann. § 91-5-1. There was evidence that Lorraine’s will was signed by her and was attested by two credible witnesses in their presence. Thus, there is evidence to support the chancellor’s decision that the will was properly executed, under Mississippi Code Annotated section 91-5-1.
¶ 31. The argument that Lorraine’s signature did not comply with the express terms of the will is a logical argument. The will clearly says that Lorraine “set my hand and placed my initials in the margins of the preceding two pages.” The will shows where she “set [her] hand” but does not show where she placed her initials on the first two pages. We recognize that the fact that the execution clause in the will states that it must also be initialed is important and may be sufficient to invalidate the will. However, Ernest and Linda have not cited any authority that requires this result.
¶ 32. Because there was evidence that Lorraine actually signed the will in the presence of two attesting witnesses, the chancellor did not err in finding the will to be validly executed. Accordingly, we find no merit to this issue.

II. Whether the chancellor erred in failing to find that the Last Will and Testament of Lorraine H. Thomas was the product of undue influence.

A. The chancellor applied an incorrect legal standard in requiring proof of wrongdoing, in addition to a confidential relationship and suspicious circumstances, before finding the presumption of undue influence.

B. The chancellor erred in finding that Richard Glenn Thomas, proponent of, and beneficiary under the Last Will and Testament of Lorraine H. Thomas, had overcome the presumption of undue influence by clear and convincing evidence.

¶ 33. In this issue, Ernest and Lorraine make two related arguments. First, they argue the chancellor was correct to find a confidential relationship between Lorraine and Glenn. However, they contend that the chancellor applied an incorrect legal standard, because she did not shift the burden of proof to Glenn and refused to acknowledge the presumption of undue influence absent actual proof of wrongdoing. Second, they argue that the chancellor erred when she found that Glenn overcame the presumption of undue influence. They claim that Glenn presented insufficient evidence to overcome the presumption of undue influence. They ask this Court to reverse and render the judgment of the chancellor and to find the will to be invalid.
¶ 34. In Noblin v. Burgess, 54 So.3d 282, 288-89 (¶¶ 17-20) (Miss.Ct.App.2010), Judge Maxwell offered a succinct statement of Mississippi law on undue influence:
A. Presumption of Undue Influence
In Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959), our supreme court crafted the confidential relationship doctrine applicable to -wills contested on the basis of undue influence. The Croft court held a presumption of undue influence arises where: (1) a confidential relationship existed between the testator and a beneficiary, and (2) the beneficiary in the confidential relationship was actively involved in some way with preparing or executing the will. A confidential relationship is present where “one person is in a position to exercise dominant influence upon the other because of the latter’s dependency on the former arising either from weakness of mind or body, or through trust.”
B. Overcoming the Presumption of Undue Influence
Croft also established that once the required showing is made to raise the presumption of undue influence, the burden shifts to the proponents to rebut the presumption by clear and convincing evidence.
In order to overcome the presumption of undue influence, the proponents must show by clear and convincing evidence: (1) the beneficiary acted in good faith; (2) the testator had “full knowledge and deliberation” in executing the will; and (3) the testator exhibited- “independent consent and action.” Factors to be considered in assessing the beneficiary’s good faith include:
(1) who initiated the procurement of the will;
(2) where the testator executed the will and who was present at the execution;
(3) what consideration was paid and who paid it; and
(4) whether the execution was done in secrecy or openly.
Factors to be assessed in determining the testator’s knowledge and deliberation in executing the will include:
(1) whether the testator was aware of his total assets and their worth;
(2) whether the testator understood who his “natural inheritors” were;
(3) whether the testator understood how his action would legally affect prior wills;
(4) whether the testator knew non-relative beneficiaries would be included; and
(5) whether the testator knew who controlled his finances and the method used:
(a) how dependent the testator is on persons handling his finances; and
(b) how susceptible the testator is to be influenced by any such persons.
Regarding the testator’s “independent consent and action,” unlike the other two prongs, there is no express list of factors. The supreme court has in the past required a showing that the testator acted on “advice of a competent person disconnected from the beneficiary and devoted wholly to the testator’s interest.” Murray v. Laird, 446 So.2d 575, 578 (Miss.1984). Though still a relevant consideration, this requirement has been absolved by more recent precedent, which has instead required “a showing of the grantor’s ‘independent consent and action’ based on all of the surrounding facts and circumstances.” Vega v. Estate of Mullen, 583 So.2d 1259, 1264 (Miss.1991).
(Internal citations omitted).
A. Confidential Relationship— Presumption of Undue Influence
¶ 35. Here, the chancellor found that the presumption of undue influence arose as a result of the relationship between Lorraine and Glenn, and Glenn’s active participation in the procurement and execution of the will. The chancellor concluded:
After reviewing the factors set forth in the Estate of Dabney, the Court finds there is a confidential relationship between Lorraine and Glenn.
Although this court has found that there is a confidential relationship between Lorraine and Glenn, such a finding does not automatically give rise to a presumption of undue influence. Something more is required in the context of a will contest, such as active participation by the beneficiary in the procurement, preparation or execution of the will or mental infirmity of the testator. Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959). In other words, there must be some showing that the beneficiary abused the relationship either by asserting dominance over the testator or by substituting her intent for that of the testator. Id.
Ernest and Linda produced evidence showing Glenn actively participated in the procurement and preparation of the Will, but no proof of wrongdoing. Glenn *120 admitted he carried Lorraine to the home of Bea Roper. He asked Ms. Roper to assist his mother in drafting a will. Glenn stayed in the room while Bea Roper and Lorraine prepared the will. However, Glenn said it was a large room[;] he was on the other side, and did not hear them conversation. Also, Glenn admitted that he filled in the four (4) blanks in paragraph two (2) of the Will in question following Lorraine’s instructions.
The contestants offered absolutely no showing of any abuse of the relationship between Glenn and Lorraine. Further, there was no showing that Glenn substituted his will for that of Lorraine. When arriving in Florida, Lorraine’s life was in disarray. She did not have available funds to retain a lawyer. The action of Glenn in transporting Lorraine to the home of Ms. Roper appeared to have been one step in an effort by Glenn to assist his mother with getting her affairs in order. The second step was the preparation and execution of a partition deed, and the third was the surrogacy designation.... There was not one shred of evidence demonstrating that Glenn did nothing [sic] but follow the directions of Lorraine.
Based on the foregoing, the Court finds that there was active participation on the part of Glenn in the procurement and, preparation of the Last Will and Testament of Lorraine Thomas. The Court further finds there was no abuse of the relationship between Glenn and Lorraine. With limited resources and no assistance from his siblings, Glenn did the best he could to care for his mother. Additionally, in caring for Lorraine, his mother, Glenn did not assert dominance over her, nor did he substitute his intent for that of hers. On the contrary, the [W]ill in question appeared to be an orderly disposition of Lorraine’s estate. In the Will, she conveyed all of her real and personal property to Glenn and Linda knowing that she was preparing to convey her interest in her husband’s business and city lots to Ernest as a[n] inter vivos gift. Further, her medical providers required her to designate a surrogate, like in the Will. Glenn was named the primary surrogate and Linda, the secondary. There is no allegation that either the deed or the designation of surrogates [was] invalid. They were all done around the same time, and [were] consistent with the disposition Lorraine made in the Will. Also, the testimony revealed that Glenn followed the directions of Lorraine in acquiring medical and physical care for her. Glenn adamantly stated that he only carried out his mother’s instructions in all that he did regarding her affairs. This allegation was not refuted.
As [a] result of the said finding, ... Ernest and Linda have failed to meet their burden of showing [there] was an abuse of a confidential relationship.
(Emphasis added).
¶ 36. The chancellor’s finding seems to be incorrect. “[A] presumption of undue influence arises where: (1) a confidential relationship existed between the testator and a beneficiary, and (2) the beneficiary in the confidential relationship was actively involved in some way with preparing or executing the will.” Noblin, 54 So.3d at 288 (¶ 17). The chancellor made the following three findings:
After reviewing the factors set forth in the Estate of Dabney, the Court finds there is a confidential relationship between Lorraine and Glenn.
Although this court has found that there is a confidential relationship between Lorraine and Glenn, such a finding does not automatically give rise to a presump *121 tion of undue influence. Something more is required in the context of a will contest, such as active participation by the beneficiary in the procurement, preparation or execution of the will or mental infirmity of the testator. Croft v. Alder ....
Based on the foregoing, the Court finds that there was active participation on the part of Glenn in the procurement and preparation of the Last Will and Testament of Lorraine Thomas.
¶ 87. At this point, the burden of proof shifted to Glenn as the proponent of the will. “Croft ... established that once the required showing is made to raise the presumption of -undue influence, the burden shifts to the proponents to rebut the presumption by clear and convincing evidence.” Noblin, 54 So.3d at 288 (¶ 18). As soon as the chancellor found the existence of a confidential relationship, the law raised a presumption that Glenn exercised undue influence over Lorraine and required Glenn disprove undue influence by clear and convincing evidence.
¶ 38. Said differently, the supreme court has held that after the confidential relationship is determined to exist:
[W]e must decide whether there was adequate proof of undue influence. Given the finding that a confidential relationship does exist between the beneficiary and the testatrix and that the beneficiary has been actively concerned in some way with the preparation or execution of the will, the law raises a presumption that the beneficiary exercised undue influence over the testatrix, and casts upon the beneficiary the burden of disproving undue influence by clear and convincing evidence. Croft v. Alder, 237 Miss. 713, 115 So.2d 683, 686 (1959). In the event that the proponents of the will do not meet this burden, the will must be held invalid.
In re Estate of Dabney, 740 So.2d 915, 920-21 (¶ 19) (Miss.1999) (citations omitted).
¶ 39. The chancellor’s opinion and order does not state whether she in fact considered the burden of proof to shift to Glenn. Instead, in the next sentence, the chancellor concluded that “[t]he Court ■further finds there was no abuse of the relationship between Glenn and Lorraine.” This indicates that the chancellor applied an incorrect legal standard because she failed to follow Croft, Estate of Dabney, and Noblin. The chancellor erred when she found a confidential relationship but did not shift the burden of proof to the proponent and beneficiary of the will.
¶ 40. The chancellor also held:
As [a] result of the said finding, ... Ernest and Linda have failed to meet their burden of showing [there] was an abuse of a confidential relationship.
Howeverif this court had found to the contrary, Glenn would have to show by clear and convincing evidence that the subject will was not the product of undue influence. In order to overcome a presumption of undue influence arising from a confidential relationship, the proponents of a will must show by clear and convincing evidence: (1) the beneficiary acted in good faith; (2) the testator had full knowledge and deliberation in executing the will; and (3) the testator exhibited independent consent and action.
Factors to be considered in assessing a beneficiary’s good faith, in order to overcome the presumption of undue influence in the creation of [the] will arising from a confidential relationship, include: (1) who initiated the procurement of the will; (2) where the testator executed the will and who was present at the execution; (3) what consideration was paid and who paid it, and (4) whether the *122 execution was done in secrecy or openly. Noblin v. Burgess, 54 So.3d 282 (Miss.Ct.App.2010).
(Citation omitted). The chancellor concluded that “Ernest and Linda have failed to meet their burden of showing [that there] was an abuse of a confidential relationship.” The chancellor also stated “if this court had found to the contrary” and concluded that Glenn would then have to show that he overcame the presumption of undue influence. The chancellor then provided her analysis of the factors. At the end, she concluded that the “Court find's that Glenn has met his burden of proof by showing by clear and convincing evidence that the subject Will was not the product of undue influence.”
¶ 41. The chancellor’s opinion applied the incorrect legal standard, and then as an alternative finding, the chancellor applied the correct legal standard. Hence, we will review the chancellor’s finding as if she had used the proper legal standard.

B. Overcoming the Presumption of Undue Influence

¶ 42. To overcome the presumption of undue influence, Glenn “must show by clear and convincing evidence: (1) the beneficiary acted in good faith; (2) the testator had ‘full knowledge and deliberation’ in executing the will; and (3) the testator exhibited ‘independent consent and action.’ ” Noblin, 54 So.3d at 288 (¶19).
¶ 43. Our review of these factors reveals an absence of any independent evidence to corroborate Glenn’s testimony. In In re Will of Fankboner, 638 So.2d 493, 495 (Miss.1994), the supreme court held:
To determine if Jones acted in good faith when she procured the September 13, 1989[ ] will, the identity of the initiating party, who sought the preparation of Fankboner’s will, must be determined. In making this determination, it is significant that Fankboner told two totally disinterested witnesses that he wanted to change his will. In Vega v. Estate of Mullen, then Presiding Justice Hawkins stated:
In those cases where you admittedly have a confidential relations transfer from a dependent to a dominant party, it seems to me that the ultimate test should be something on the order of the following: Excluding the testimony of the grantee, those acting in the grantee’s behalf (such as the attorney), and any others who could have a direct or indirect interest in upholding the transfer (such as grantee’s family), is there any other substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true,-un-tampered, genuine interest of the grantor ? If the answer to this question is yes, then it becomes a question of fact whether or not there was undue influence. If the answer is no, then as a matter of law the transfer is voidable.
Vega v. Estate of Mullen, 583 So.2d 1259, 1275 (Miss.1991) (Hawkins, P.J., dissenting).
(Emphasis added).
¶ 44. We examine the chancellor’s review of the ápplieable factors to determine if there was substantial evidence to support the conclusion that Glenn disproved undue influence by clear and convincing evidence. See In re Will of Fankboner, 638 So.2d at 496 (citation omitted).

1. Whether Glenn, as the beneficiary, acted in good faith.

■ ¶ 45. The court must consider whether Glenn acted in good faith. The factors to consider include: “(1) who initiated the *123 procurement of the will; (2) where the testator executed the will and who was present at the execution; (3) what consideration was paid and who paid it; and (4) whether the execution was done in secrecy or openly.” Noblin, 54 So.3d at 288 (¶ 19).

a. Who initiated the procurement of the will?

¶ 46. The chancellor found:
According to Glenn, he mentioned to his mother, Lorraine, about the making of a will after the death of a man they both knew. His mother did not address that issue at that time. At some subsequent time, Lorraine brought the subject up about the will. [Glenn] sought the assistance of Bea Roper to assist his mother, Lorraine, in the drafting of her Will. Although Glenn first mentioned the need for a will and carried Lorraine to Bea Roper for her assistance, it appears that Glenn was following the direction of Lorraine in assisting her with the procurement of her Will.
¶ 47. The most significant finding by the chancellor was that “it appears that Glenn was following the direction of Lorraine in assisting her with the procurement of her Will.” Roper prepared the will, but it was not complete. The will included several blanks in very important provisions, which were later completed by Glenn. Based on the principle in In re Will of Fankboner, there is simply no independent evidence that would corroborate the chancellor’s finding that Glenn was simply following Lorraine’s directions. There was certainly not clear and convincing evidence that would support this finding.
¶ 48. Further, it is undisputed that Glenn played a significant role in the preparation and execution of Lorraine’s will. Lorraine consulted with Roper at Glenn’s suggestion. Lorraine had no independent relationship with Roper. Roper was not an attorney. Instead, she was Glenn’s friend and coworker. Lorraine did not pay Roper any consideration for her services in drafting the will. Instead, Roper drafted the will as a favor to Glenn. Glenn drove Lorraine to the meeting with Roper to have the will drafted. Glenn remained in the room as Lorraine and Roper discussed the specifics of the will for about fifteen to twenty minutes.
¶ 49. On page three of the will, it states “IN WITNESS WHEREOF, I have hereunto set my hand and placed my initials in the margins of the preceding two pages, in the presence of two (2) witnesses and declare this instrument to be my Last Will and Testament.” Despite the existence of this language, Lorraine’s initials do not appear anywhere upon the first two pages of the purported will. Glenn had no explanation for the absence of Lorraine’s initials from the first two pages of the will, despite Lorraine’s experience as a legal secretary for fifteen years. Instead, Glenn stated that it was Lorraine’s significant legal experience that explained her failure to ever consult with a lawyer about the drafting of a will.
¶ 50. Indeed, the evidence does not appear to support the chancellor’s finding. Glenn was substantially involved in the procurement of the will. Certainly, the evidence does not support a finding that Glenn acted in good faith in the initiation of the procurement of the will.

b. Where did the testator execute the will?

¶ 51. The chancellor found that “Lorraine executed the will in a drug store in Florida on August 29, 1993. The execution took place in a public place open for all to see.” Glenn accompanied Lorraine inside City Drugs to execute the will. City Drugs was chosen by Glenn because it had a notary sign. Glenn testified that he paid *124 Livingston, whom he believed to be a notary public, a notary fee for the execution of the will, even though no notary seal was on the will.
¶ 52. The evidence does not support the chancellor’s conclusion. Glenn chose the place where the will would be executed and paid the costs of execution.
c. What consideration was paid and who paid it?
¶ 53. The chancellor found that “Bea Roper, a non-attorney, drafted the will. No compensation was paid.” Roper was not an attorney. She was Glenn’s friend and coworker. More importantly, Lorraine did not pay Roper any consideratión for her services in drafting the will. Instead, Roper drafted the will as a favor to Glenn. Roper was not paid compensation for drafting the will; instead, her motivation for providing this service was based on her friendship with Glenn.

d. Whether the execution was done in secrecy or openly?

¶ 54. The chancellor found: “According to Livingston, the [w]ill was executed at the pharmacy counter in the drug store. Any person in the drugstore could have observed her executing the will in question.” The will was apparently executed in a public place. However, Glenn then retained the original will and kept it in a safe-deposit box, which Lorraine could not access. Ernest and Linda claimed that they did not know of the will or about its procurement and execution until one month after Glenn initiated a wrongful-death action in Florida after Lorraine’s death.
¶ 55. Considering each of these factors, there is no evidence that would support the chancellor’s finding of Glenn’s good faith. Instead, based on the evidence presented, we conclude that Glenn was involved in the procurement of the will and the evidence would weigh against Glenn acting in good faith.

2. Whether Lorraine had fall knowledge and deliberation in executing the will in question.

¶ 56. Factors to be considered in determining the testator’s knowledge and deliberation in the execution of the will include (1) whether the testator was aware of her total assets and their worth; (2) whether the testator understood who her “natural inheritors” were; (3) whether the testator understood how her action would legally affect prior wills; (4) whether the testator knew non-relative beneficiaries would be included; and (5) whether the testator knew who controlled her finances and the method used, including consideration of (a) how dependent the testator is on person(s) handling her finances, and (b) how susceptible the testator is to be influenced by any such person(s). Noblin, 54 So.3d at 288 (¶ 19).

a. Whether Lorraine was aware of her total assets and their worth.

¶ 57. The chancellor found: “A partition deed was executed by Lorraine approximately 25 days after the preparing of the Will. The said deed was executed by Lorraine and her children. The partition deed conveyed to Ernest his parcels of land in severalty, while Lorraine, Linda, and Glenn continued to hold their title jointly.”
¶ 58. Yet, the chancellor made no finding whether Lorraine was aware of her total assets and their worth. To the contrary, there was evidence that Glenn arranged for Lorraine’s mail to be forwarded to his residential address. Glenn received all of Lorraine’s bills and bank statements. Glenn also received Lorraine’s social-security checks, which were deposited into Glenn’s personal checking account. The monthly rental income received by Lorraine by direct deposit into her checking *125 account, maintained at the Bank of Yazoo City, was used by Glenn. Because Glenn had control over all monies received by or available to Lorraine, Glenn assumed responsibility for the payment of all of her bills and signed all checks written on her Bank of Yazoo City checking account. Glenn handled all of Lorraine’s real estate interests. The evidence established that Glenn handled all of Lorraine’s financial affairs.
¶ 59. Before she moved to Florida, Lorraine had several accounts in Mississippi. Glenn, based on the authority of the power of attorney, closed all Mississippi accounts except for the checking account maintained at the Bank of Yazoo City. Glenn also removed the contents of Lorraine’s safe-deposit box. At Glenn’s request and initiative, Lorraine also executed a Florida power of attorney on the same date and under the same circumstances as the will.
¶ 60. Lorraine also executed a promissory note in favor of BankPlus, in the principal amount of $25,000. The note was secured by a deed of trust on Lorainne’s Yazoo City home. Glenn’s deposition testimony established that the loan proceeds were used by him as a down payment on his town home in Florida.
¶ 61. As to the partition deed, Ernest and Linda respond that, unlike the drafting and execution of the will, the partition deed was a joint effort of Ernest, Glenn, and Linda, all of whom were informed, knowledgeable, and in agreement.- In addition, Lorraine’s husband and the father of Ernest, Linda, and Glenn, died intestate on October 5, 1991. His estate was comprised of real property located on Grand Avenue in Yazoo City and West Broadway in Yazoo City, and approximately 175 acres of farmland located in Yazoo County. Because of the intestate estate, Lorraine, Ernest, Linda, and Glenn were to be coten-ants, each to hold an undivided interest in each asset of their father’s estate. To avoid any ownership interest with his brother, Ernest asked his mother and his siblings to consider and execute a partition deed so that he would not be a cotenant of Glenn, thereby protecting whatever asset he ultimately held from his father’s estate against the action or inaction of Glenn. Also, in exchange for the property located on West Broadway, Ernest conveyed his interest in the Grand Avenue property and the 175 acres of farmland to Linda, Glenn, and Lorraine. Glenn testified that Ernest represented, and it was the understanding of Glenn, Linda, and Lorraine, that the property acquired by Ernest from his father’s estate by virtue of the partition deed was the only property Ernest was to take from either his father’s estate or his mother’s estate. Ernest disputed this testimony and testified that the partition deed only pertained to that property he was to take from his father’s estate. Ernest did not agree, by virtue of the partition deed, to voluntarily relinquish any interest he was to have in Lorraine’s estate.
¶ 62. The evidence presented does not support the chancellor’s findings. There was no evidence that would support the conclusion that Lorraine was aware of her total assets and their worth.
b. Whether Lorraine understood who her “natural inheritors” were.
¶ 63. The chancellor found:
All the evidence indicated that Lorraine understood that her children were her natural inheritors. She willed her interest in land she owned jointly to the two (2) children who held the title with her. She planned to give the child she disinherited what he wanted inter vivos. Lorraine executed a partition deed to carry this plan out twenty-five (25) days after she executed the Will in question.
¶ 64. There was no evidence to support the chancellor’s finding on this issue. There was no independent evidence that *126 indicated Lorraine understood who her natural inheritors were. All of the evidence indicated that Lorraine was in poor physical health. In fact, Lorraine died as a result of injuries sustained in an automobile accident. Lorraine suffered from chronic alcoholism throughout her life, having been hospitalized on at least two occasions for treatment for alcohol addiction. When she moved to Florida, Lorraine was prescribed and was taking the medication Librium, which provided for the short-term relief of symptoms related to alcohol withdrawal. Lorraine also suffered from cirrhosis of the liver, Graves Disease, atrial fibrillation, and seizures; she was prescribed Dilantin to treat the latter condition. Lorraine also was in treatment for depression, for which she was prescribed Zoloft, and remained under the continuous care of a psychologist while she lived in Florida.
¶ 65. Lorraine was unable to care for herself. Indeed, Glenn testified that Lorraine “couldn’t take care of herself.” As a result, Glenn took care of Lorraine’s business. When she arrived in Florida, Lorraine spent one night in Glenn’s home. She resided, instead, in at least four different foster homes that Glenn located through the Okaloosa Council on Aging.
¶ 66. There was simply no evidence, other than from Glenn, to support the conclusion that Lorraine understood who her “natural inheritors” were,

c.Whether Lorraine understood how her action legally affected prior wills.

¶ 67. The chancellor found:
Although Lorraine only made one (l)[W]ill, she and her children executed the aforementioned partition deed. The Will was executed August 29,1993[,] and the partition deed was executed on September 24,1998. The land and property conveyed to Ernest, via said partition deed, was where the business of his deceased father was located. In exchange, Ernest conveyed his interest in the remaining real property to Lorraine, Glenn, and Linda. The result of this conveyance gave Ernest his inheritance outright, while[ ] Glenn and Linda continued to own their property jointly with their mother, Lorraine. This deed appears to have been a second step in the estate planning of Lorraine whereby she gave to her estranged son[] his inheritance[ ] by an inter vivos gift. As stated above, this partition deed was executed only 25 days after the Will in question. Ernest and Linda did not allege the deed was the subject of undue influence or that Lorraine lacked mental capacity to execute the same. Therefore, the Court is of the opinion that Lorraine understood very clearly how her [W]ill affected the disposition of her estate.
¶ 68. The chancellor placed great weight on the partition deed. Having reviewed the testimony about the partition deed, we do not find that the execution of the partition deed indicates that Lorraine “understood very clearly how her will affected the disposition of her estate.” However, we recognize that there was slight evidence to support the chancellor’s conclusion as to this factor.

d.Whether Lorraine knew non-relative beneficiaries would be included.

¶ 69. The chancellor found: “Lorraine made no conveyances to non-relative beneficiaries.” Hence, the chancellor found no evidence under this factor to establish that Lorraine had full knowledge and deliberation in executing the will.

e.Whether Lorraine knew who controlled her finances and the method used, including consideration of (a) how dependent the testator was on the person handling her finances, and (b) how susceptible Lorraine was to be influenced by that person.

¶ 70. The chancellor found:
*127 Lorraine was aware that Glenn had control over her finances. She gave him that control by executing, not one (1), but two (2) powers-of-attorney, which, among other things, authorized Glenn to manage Lorraine’s financial affairs.
Glenn paid all of Lorraine’s expenses from the funds that were under his control. The evidence reflected that all his actions were in the best interest of Lorraine. When Lorraine came under his care, she was in debt. By the time of her death, she was financially stable and appeared to have been adequately taken care of.
According to the testimony, when Lorraine came to live in Florida .under Glenn’s control, she had debt in excess of $20,000.00. She was unable to work and living on Social Security Benefits and rental income. Lorraine was abusing alcohol, and in and out of rehabilitation facilities. Glenn took control of her finances, found caregivers for her, and provided adequate medical services. Lorraine became debt free because of Glenn’s handling of her affairs, and she died a reasonably healthy woman, a victim of an automobile accident, not cirrhosis of the liver, alcoholism, Graves Disease, or any other aliment she complained of during her lifetime.
Based on the foregoing, this Court finds that Lorraine had full knowledge and deliberation in executing the will in question.
¶ 71. The chancellor’s findings seem to support Ernest and Linda rather than Glenn. Lorraine signed two powers of attorney in favor of Glenn. She knew he had the authority to handle her property. Yet there was no independent evidence that indicated Lorraine was aware of the methods Glenn used in controlling her finances. It is important to note that Glenn arranged for Lorraine to execute a $25,000 promissory note, secured by a deed of trust to her Yazoo City home, which Glenn used as a down payment for his Florida home. BankPlus’s claim against the estate was not allowed by the chancellor. Apparently, the evidence supported a finding that Lorraine knew who controlled her finances, but there was not evidence to support a finding that she knew the method used in controlling her finances. The evidence indicted that Lorraine was totally dependent on Glenn to handle her finances, and that she was susceptible to be influenced by him.
¶ 72. We find that there was not clear and convincing evidence that Lorraine had full knowledge and deliberation in executing the will in question.

3. Whether Lorraine exhibited “independent consent and action.”

¶ 73. The final factor, overcoming the presumption of undue influence, required Glenn to prove by clear and convincing evidence that Lorraine exhibited “independent consent and action.” In Noblin, the Court held:
Regarding the testator’s “independent consent and action,” unlike the other two prongs, there is no express list of factors. The supreme court has in the past required a showing that the testator acted on “advice of a competent person, disconnected from the beneficiary and devoted wholly to the testator’s interest.” Murray v. Laird, 446 So.2d 575, 578 (Miss.1984). Though still a relevant consideration, this requirement has been absolved by more recent precedent, which has instead required “a showing of the grantor’s ‘independent consent and action’ based on all of the surrounding facts and circumstances.” Vega v. Estate of Mullen, 583 So.2d 1259, 1264 (Miss.1991).
*128 Noblin, 54 So.3d at 288-89 (¶ 20). We will analyze these factors as the chancellor did.

a.Did Lorraine seek the advice of a competent person?

¶ 74. The chancellor found:
There was no evidence that Lorraine sought the advice of a competent person. However, the evidence did show that Lorraine was in her own right, fairly educated, and not a stranger to the legal profession. Prior to her retirement, Lorraine was employed as a legal secretary for about three (3) years, and a deputy circuit clerk for about eleven (11) or twelve (12) years.
According to the testimony, Lorraine was employed as a legal secretary for Attorney Wiley Barbour. This Court is aware that a substantial portion of Mr. Barbour’s practice involves chancery work, including the opening and closing of probate estates, and the preparation of wills. As a legal secretary, Lorraine’s duties would have included typing wills, estate documents, and attending to other matters related to wills and estates. Therefore, this Court finds that although Lorraine did not seek advise, she was knowledgeable of estate matters, having worked in the profession for several years.
¶75. The findings under this factor contradict the chancellor’s other findings. There was simply no evidence to indicate that Lorraine sought the advice of a competent person. Thus, there was no evidence under this prong to exhibit independent consent and action.

b.Did Lorraine seek the advice of a person disconnected from the beneficiary?

¶ 76. The chancellor found:
The evidence did not show whether Lorraine sought a person disconnected from the beneficiary when she decided to make her Will. However, the testimony revealed that Glenn did mention to Lorraine the need for a will. Lorraine did not make the will at the time Glenn suggested. Rather, she took some time alone to ponder her need for a will. Thus, disconnecting herself from Glenn, until she could make a decision as to whether she wanted to make a will.
Therefore, this Court finds that Lorraine disconnected herself from Glenn to make a decision as to whether she desired to make a will.
¶ 77. Once again, the findings under this factor contradict the chancellor’s other findings. There was simply no evidence to indicate that Lorraine sought advice from a person disconnected from Glenn,

c.Devotion to Lorraine’s Interest

¶ 78. The chancellor found:
As stated earlier, Lorraine disconnected herself from Glenn as she pondered the idea of making a will. No person is more devoted to Lorraine’s interest than Lorraine herself. Lorraine made up her mind as to the disposition she desired to make of her property at her death. She conveyed this plan to Bea Roper, without any input from Glenn. The testimony revealed that although Glenn was in the room as the Will was being prepared, he did not take part in the conversation between Bea Roper and Lorraine. As a matter of fact, Glenn testified that he was on the opposite side of the room, and he could not hear what they were saying. He further stated he suffers from hearing loss, which was evident throughout these proceedings.
Furthermore, the subscribing witnesses stated in their affidavits that Lorraine was of sound and disposing mind at the time she executed the Will in question. Livingston, one of the subscribing wit *129 ness[es], testified that Lorraine advised him she was aware of the contents of her [W]ill, and she appeared not [to] be under any duress when she executed the [W]ill in question.
Therefore, this Court finds that Lorraine exercised independent consent in the preparation and execution of her Will.
¶ 79. The evidence does not support this finding. There was no evidence that Lorraine exhibited independent consent and action. The evidence was, however, clear that Lorraine did not seek independent legal advice or counsel from any person not connected with Glenn. In fact, the will was drafted by a friend of Glenn’s at his suggestion. Glenn drove Lorraine to the meeting with Roper to draft the will and was present at that meeting. Glenn then “filled in” the blanks in the will. He also took Lorraine to get the will executed. He chose where the will would be executed, and it was executed on a Sunday. The only conclusion the evidence allows is that Glenn’s active participation in the execution of the will precludes a finding that Lorraine exercised the independent consent and action necessary to rebut a presumption of undue influence.
C. Conclusion
¶ 80. Based on the foregoing, we find that the chancellor’s findings of fact were not supported by substantial credible evidence. Further, the chancellor’s findings were manifestly wrong and clearly erroneous. In addition, we find that the chancellor applied an erroneous legal standard by not shifting the burden of proof immediately upon finding a confidential relationship. We find that Glenn failed to overcome the presumption of undue influence by disproving undue influence by clear and convincing evidence. See Croft v. Alder, 115 So.2d at 686.
¶ 81. Therefore, we reverse and render judgment in favor of Ernest and Linda and find the last will and testament of Lorraine to be invalid. This case is remanded to the Chancery Court of Yazoo County for the administration of Lorraine’s estate in the absence of a will.
¶ 82. THE JUDGMENT OF THE CHANCERY COURT OF YAZOO COUNTY IS REVERSED; JUDGMENT IS RENDERED IN FAVOR OF THE APPELLANTS; AND THIS CASE IS REMANDED TO THE CHANCERY COURT FOR ADMINISTRATION OF THE ESTATE IN THE ABSENCE OF A WILL, CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
ISHEE, ROBERTS, CARLTON, MAXWELL AND JAMES, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. IRVING, P.J., BARNES AND FAIR, JJ., CONCUR IN PART AND IN THE RESULT.