830 So.2d 699 (2002)
In the Matter of the ESTATE OF Manival EVANS, Deceased Madie Tinsley, Appellant,
v.
Elvator (Faye) TAYLOR, Stonie (E.C.) Evans, Robert Evans, Oliver Evans, Rosie Watkins, Tommy Evans, Elaine Allen, Edward Neal, Jr., Minnie Neal, Mary Evans Brown, Sammie Evans, Ernest Evans, Eva Lee Watts, Trentice Wilson and Crosie Velt Evans, Appellees.
No. 2001-CA-01173-COA.
Court of Appeals of Mississippi.
November 12, 2002.
*700 Marshall E. Sanders, Vicksburg, attorney for appellant.
Allen Lamar Burrell, Port Gibson, Robert Andrews, attorneys for appellee.
Before McMILLIN, C.J., MYERS and CHANDLER, JJ.
McMILLIN, C.J., for the Court.
¶ 1. Manival "Doc" Evans executed a will a few days before his death. His close friend Madie Tinsley was the sole beneficiary under the will. Heirs of the decedent were successful in convincing the chancellor that Tinsley had a confidential relationship with the decedent, and that the resulting presumption of undue influence was not overcome. Tinsley appeals, raising factual issues. We find no error in the chancellor's evaluation of the evidence. Therefore, we affirm.

I.

Facts
¶ 2. Manival Evans was eighty-nine years old when he was admitted to a hospital on February 29, 2000. While there, he was diagnosed with advanced and terminal cancer. He would die a few weeks later on March 18. His relationship with Madie Tinsley, and her actions in causing a will to be prepared that named her as sole beneficiary, are at the center of this appeal.
¶ 3. Tinsley and Evans were both widowed, and Evans had no children. Tinsley testified that they lived a quarter mile apart in rural Claiborne County. She claimed that they conducted themselves as a married couple over the last fifteen years of the testator's life. She testified that she cooked for him, cleaned his house, bathed and dressed him, and stayed overnight at his house for some period of time. Tinsley was about twenty years younger than Evans.
¶ 4. Tinsley's testimony was that while in the hospital, Evans asked her to find a lawyer to prepare his last will and testament. On the day that Evans was admitted to the hospital, Tinsley contacted an attorney whom neither of them knew, Marshall Sanders. Sanders was unable to counsel with Evans at the hospital. In the alternative, Sanders suggested that Tinsley provide him with a writing expressing the testator's wishes for the distribution of his estate. Tinsley brought to him a handwritten explanation, supposedly prepared by Evans. After Sanders prepared the will, Tinsley returned to his office to get it. Evans's handwritten notes were not produced during these proceedings. Sanders explained to Tinsley the requirements for execution. Tinsley did not ask any of the doctors or nurses at the hospital to serve as witnesses. Instead, Tinsley kept the will in her purse until her brother and daughter-in-law accompanied her to the *701 hospital three days after she had obtained the will. On March 3, 2000, they served as witnesses as Evans executed the will.
¶ 5. In Evans's will, Tinsley was named as executrix and as the sole beneficiary of his estate. This included 200 acres of land, a house, two cars, a tractor, a few farm animals and all the money in his bank accounts.
¶ 6. Evans died on March 18, 2000. On March 20, Tinsley removed the contents of a safety deposit box that she and Evans held jointly and that had been opened the previous year. She testified that only her personal possessions were in the box. The bank records revealed that Evans had been the only person to use the box prior to the time that Tinsley closed it.
¶ 7. After attorney Sanders had the will admitted to probate, some of Evans's heirs filed a complaint seeking to have the will set aside on the grounds of undue influence. That is what occurred, by decree dated June 28, 2001. Tinsley appealed.

II.

Discussion
¶ 8. We are reviewing the decision of a chancellor who after an evidentiary hearing, made findings regarding the credibility of witnesses and the weight to be given to the evidence. Our role on appeal is to determine if those findings are supported by substantial evidence, whether the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or whether he applied an erroneous legal standard. In re Estate of Mathis, 800 So.2d 119, 121 (¶ 7) (Miss.Ct.App.2001).
¶ 9. This case is about the effect of a confidential relationship between a testator and the sole beneficiary of a will. Tinsley's counsel has admitted that a confidential relationship existed. That being so, a legal presumption arises that undue influence was exercised. That presumption must be overcome by clear and convincing evidence. McDowell v. Pennington, 394 So.2d 323, 325 (Miss.1981). Since Tinsley acknowledges the relationship, we examine the evidence that the chancellor had before him on undue influence.

Undue Influence
¶ 10. The supreme court has determined that a presumption of undue influence is necessary, once a confidential relationship between testator and beneficiary is shown. Thus a case such as this often involves little or no direct evidence of any improper conduct. The presumption exists because of the difficulty in knowing what has occurred in the private confidences between individuals, one of whom is no longer living. Therefore, a case such as this requires that the beneficiary rebut the presumption. What must be shown to rebut has been identified by the supreme court:
(1) good faith on the part of the grantee/beneficiary;
(2) the grantor's full knowledge and deliberation of his actions and the consequences; and
(3) advice of (a) a competent person (b) disconnected from the grantor and (c) dedicated wholly to the grantor/testator's interest.
Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984). The last element has been changed. Because of the rarity of such independent advice, the Court decided the factor needed to be softened. What is now needed is proof of "independent consent and action," even if no third person counseled the testator. Mullins v. Ratcliff, 515 So.2d 1183, 1193 (Miss.1987).
(1) Beneficiary's good faith
¶ 11. Among a chancellor's considerations in determining good faith are *702 these: a) the person who initiated the procurement of a will; b) the location at which the will was executed and the individuals who were present; c) the payment of consideration for the will; d) if paid, the person who paid it; and e) the relative secrecy or openness in the execution. In re Last Will and Testament and Estate of Smith, 722 So.2d 606 (¶ 22) (Miss.1998). From each perspective, the chancellor is determining the extent and exclusiveness of involvement by the person with a confidential relationship.
¶ 12. Tinsley contacted attorney Sanders about making a will. No one except Tinsley talked with Evans about the terms of the will, and the paper that Evans prepared explaining his testamentary wishes no longer existed. At no time did Sanders communicate with Evans in person or by telephone. Tinsley paid Sanders his one hundred dollar fee from her own money. Execution of the will did not immediately occur, despite the stated urgency arising from Evans's dire condition. Instead, Tinsley kept the will in her purse from Tuesday, February 29, 2000, until Friday, March 3, 2000. The sole witnesses to the will may have been Tinsley's own brother and daughter-in-law, though there was evidence of an unidentified additional person. The will was executed in the privacy of Evans's hospital room. Each of these considerations reveal substantial, indeed largely exclusive involvement by the person with the confidential relationship.
¶ 13. Other considerations as to good faith mentioned by the chancellor was that Tinsley was initially evasive about what was in the safety deposit box; the judge finally directed her to answer the question. Bank records indicated that the only person who had prior to Evans's death used the box was Evans himself, and that was in March 1999 when he rented it. Evans paid the rent on it. Yet Tinsley testified that when she retrieved the contents of the box two days after Evans's death, the box only contained her own marriage certificate and the birth certificates of her children and grandchildren. She then kept these documents in a jar in her home.
¶ 14. Other evidence came from Evans's grandnephew and grandniece. They testified that Evans had told them that he had a will in the safety deposit box that would benefit "his people."
¶ 15. There were credibility choices to make. There was self-interest by all who testified. We find no manifest error in the chancellor's conclusion that good faith was not clearly proven.
2. Testator's full knowledge and deliberation of the consequences of his act.
¶ 16. The supreme court has also identified considerations for a chancellor and a reviewing court on whether a testator knew and deliberated about the consequences of a will:
a. Was the testator aware of his total assets and their general value?
b. Did the testator understand who his natural inheritors were?
c. Did the testator understand how the change would legally affect prior wills?
d. Did the testator know that non-relative beneficiaries would be included?
e. Did the testator know who controlled his finances and by what method?
Estate of Smith, 722 So.2d 606 (¶ 22) (Miss.1998).
¶ 17. There was very little evidence on this. Attorney Sanders had not counseled with Evans, as Tinsley acted as the intermediary both in having the will prepared and then in getting directions on its execution. There was testimony that Evans's intent was to provide for "his people." A relative stated that Evans had *703 discussed with certain family members keeping the land in the family. This testimony conflicts with the distributions as set forth in the will.
¶ 18. On the other hand, Evans's physician testified that his patient had been surprisingly lucid during this last illness, as competent as a person of his age and condition could be. However, Evans did not discuss his assets with the doctor, that he was having a will prepared, or any other related matter. They discussed Evans's physical condition. While the doctor may be able to establish that Evans was mentally competent, that is not enough to show the absence of undue influence.
¶ 19. We find little evidence that Evans acted with full knowledge and deliberation.
(3) Independent consent and action.
¶ 20. Evans did not even get advice from the lawyer who drafted his will for him. The lack of communication and interaction is evident in that Manival Evans's unusual first name is misspelled four times in his own will. Tinsley found the lawyer. She provided instructions to the lawyer and she had the will executed. There was no evidence of independent action on the part of Evans.
¶ 21. Tinsley had the burden of producing clear and convincing evidence to rebut the presumption of undue influence. She did not carry this burden. This is not the same as a finding that Tinsley exerted inappropriate influence that overcame the testator's will and caused him to execute a will that he would not otherwise have accepted. This is solely a finding that under the law, once the presumption arises from the existence of such a close and influential relationship, it must be overcome by positive evidence and reasonable inferences. We find no error.
¶ 22. THE JUDGMENT OF THE CLAIBORNE COUNTY CHANCERY COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.