# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CP-00513-SCT

*IN THE MATTER OF THE ESTATE OF*
*FREDERICK ADAMS BIDDLE, DECEASED:*
*RICHARD BRIAN BIDDLE AND BRIAN BAINES*
*BIDDLE*

*v.*

*DIANNE BIDDLE*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/26/2021 |
| TRIAL JUDGE: | HON. C. MICHAEL MALSKI |
| TRIAL COURT ATTORNEYS: | R. H. "BO" BURRESS, III |
| | MICHAEL BLAKELY GRATZ, JR |
| | JOHN A. FERRELL |
| | GEORGE E. DENT |
| | JAMES TRAVIS BELUE |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | RICHARD BRIAN BIDDLE (PRO SE) |
| | BRIAN BAINES BIDDLE (PRO SE) |
| ATTORNEY FOR APPELLEE: | JOHN A. FERRELL |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 06/29/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Richard Biddle (Richard) and Brian Biddle (Brian) question whether the Chancery Court of Tishomingo County had jurisdiction over their father's estate. Brian and Richard also appeal the chancery court's finding that there was no evidence of undue influence by their stepmother. This Court finds that venue and jurisdiction are proper and that no evidence

of undue influence was presented. Thus this Court affirms the chancery court's decision.

## FACTS AND PROCEDURAL HISTORY

¶2.     Frederick Adams Biddle (Rick) died on April 27, 2017 in his Florence, Alabama home. His surviving heirs-at-law were his wife of more than twenty-seven years, Dianne Biddle, and his two sons by a previous marriage, Brian and Richard. Rick left behind a large estate, including property in both Tishomingo County, Mississippi, and Lauderdale County, Alabama.

¶3.     Prior to his death, in early 2016, Rick hired attorney R.H. Burress, in Iuka, Mississippi, to revise his will. The revision included changing the property to be inherited by Nellie Biddle, Brian's daughter and Rick's only grandchild, from a direct inheritance to a trust. In late 2016, Rick additionally revised the bequest to Brian from $50,000 to $1.

¶4.     The revised will was given to Rick on March 7, 2017. On March 10, 2017, Rick took the will to his long-time accountant, Stanley Huffaker, in Lauderdale, Alabama. There, Rick signed and published the will, which was witnessed by Stanley Huffaker and Myra Lovell, and notarized by Dianne Rickman. After they scanned a copy of the will into their records, Rick took the original will back to his home in Florence, Alabama. A few days later, Dianne returned the will to Burress's office. This will left $1 to Brian, $50,000 to Richard, and $400,000 and land to Dianne. Excluding some other specific bequests, the remainder of Rick's assets, including his Alabama home and a radio station he owned, Biddle & Sons, were left to Nellie's trust.

¶5.     During this time, Rick was suffering from pancreatic cancer. After surgery at the

2

University of Alabama at Birmingham hospital, Rick returned to his Alabama home where he received hospice care, including morphine. After his death, Dianne petitioned the Tishomingo County Chancery Court to probate Rick's estate. Dianne was appointed executrix in May 2017.

¶6.     Brian and Richard contested the will and asked the court to discharge Dianne as the executrix. They asserted that Dianne used undue influence over Rick and that the circumstances surrounding the creation and execution of his will were suspicious. Over the next few years, while the case was pending, Rick's property was distributed, including the sale of his Alabama home and the radio station, with the proceeds going to Nellie's trust.

¶7.     In January 2020, Dianne filed a motion for summary judgment. Brian and Richard opposed, asserting "(1) the absence of original will; (2) alteration of original will; (3) lack of testamentary capacity; (4) . . . undue influence; and (5) flaws in the execution" of the will. The chancery court granted summary judgment in Dianne's favor. Brian and Richard appealed to this Court the question of jurisdiction and the grounds of undue influence.

### DISCUSSION

> I.      *Whether the Chancery Court of Tishomingo County, Mississippi, had jurisdiction and proper venue over Rick's estate.*

¶8.     "Jurisdictional issues are reviewed by this Court de novo." ***Jones v. Billy***, 798 So. 2d 1238, 1239 (Miss. 2001) (citing ***Harrison v. Boyd Miss., Inc.***, 700 So. 2d 247, 248 (Miss. 1997)).

¶9.     Rick's will was probated in the Tishomingo County Chancery Court as the last will and testament of a Mississippi resident. Brian and Richard filed their petition contesting

Rick's will in Tishomingo County. They assert that Alabama, not Mississippi, would be the proper jurisdiction and venue of the estate. The question of Rick's domicile was raised for the first time in Richard's response to the summary judgment motion. This response was submitted March 2, 2020, two years after the first petition for probate and Brian and Richard's response.

¶10. "Subject matter jurisdiction is the power of the court to hear and determine cases in the general class to which the particular case belongs." *Kelly v. Cuevas (In re Est. of Kelly)*, 951 So. 2d 543, 548 (Miss. 2007) (citing *In re Will of Case v. Case*, 246 Miss. 750, 758, 150 So. 2d 148 (1963)). Subject matter jurisdiction questions may be raised at any time or *sua sponte*. *McQuirter v. Archie*, 311 So. 3d 1147, 1151 (Miss. 2020) (quoting *Common Cause of Miss. v. Smith*, 548 So. 2d 412, 414 (Miss. 1989)). The chancery court has subject matter jurisdiction over probate and estate matters or "[m]atters testamentary and of administration[.]" Miss. Const. art. 6, § 159(c).

¶11. Brian and Richard rely on Mississippi Code Section 91-7-1, which clearly states that venue is appropriate where the testator "had a fixed place of residence" or was domiciled. Miss. Code. Ann. § 91-7-1 (Rev. 2021). Questions of venue and jurisdiction must be raised in a timely manner or waived. *Belk v. State Dep't of Pub. Welfare*, 473 So. 2d 447, 451 (Miss. 1985); *Jones v. Chandler*, 592 So. 2d 966, 970 (Miss. 1991). Although Rick's domiciliary status could have been challenged by Brian and Richard, it was not, and it is now time-barred, *Belk*, 473 So. 2d at 451; *Jones*, 592 So. 2d at 970. Jurisdiction and venue were therefore proper.

4

> II. *Whether the chancery court erred by granting summary judgment in favor of Dianne on the issue of undue influence.*

¶12. In reviewing a grant of summary judgment, this Court conducts a *de novo* review. ***Karpinsky v. Am. Nat'l Ins. Co.***, 109 So. 3d 84, 88 (Miss. 2013). Summary Judgment is appropriate when the movant shows that "(1) no genuine issue of material fact exists, and (2) on the basis of the facts established, he is entitled to judgment as a matter of law." ***Id.*** (internal quotation mark omitted) (quoting ***Palmer v. Biloxi Reg'l Med. Ctr., Inc.***, 564 So. 2d 1346, 1355 (Miss. 1990)). The evidence is to be viewed "in the light most favorable to the non-moving party[,]" and, while "given the benefit of every reasonable doubt," the nonmovant may not rest upon mere allegations or denials. ***Moss v. Batesville Casket Co.***, 935 So. 2d 393, 398-99 (Miss. 2006); Miss. R. Civ. P. 56(e).

¶13. In considering summary judgment motions, the trial court does not try the issues, it only determines if there are issues to be tried. ***Brown v. Credit Ctr., Inc.***, 444 So. 2d 358, 362 (Miss. 1983) (citing Miss. R. Civ. P. 56). The trial court must review carefully all of the evidentiary matters before it, including "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any[.]" ***Karpinsky***, 109 So. 3d at 88 (internal quotation mark omitted) (citing Miss. R. Civ. P. 56(c)).

¶14.      Appellees, as proponents of the will, have the burden of proving the will throughout. They meet this burden by showing the will was duly executed and admitted to probate. When the will is admitted to probate, proponents put on *prima facie* evidence that the testator had testamentary capacity and further that no undue influence was placed upon him. The burden of going forward then shifts to contestant, who must overcome the presumption raised by proponents that testator had testamentary capacity, (and, therefore, that the testator's execution of the will was a

5

free and voluntary act).

> When the Mississippi Rules of Civil Procedure come into play within a situation involving a contest to will, where movants for summary judgment (appellees) have shown there is no genuine issue of material fact vis-a-vis probate of the will, contestant, as the adverse party, . . . must set forth specific facts showing that there is a genuine issue for trial."

*Gallagher v. Warden (In re Will of Launius)*, 507 So. 2d 27, 29 (Miss. 1987) (citations omitted).

### A. Presumption of Undue Influence Due to Beneficiary Involvement, Dominance, or Substitution of Will

¶15.    Mississippi Code Section 91-7-33 states that "[a foreign] *will may be contested as the original might have* been if it had been executed in this state, or the original will may be proven and admitted to record here." Miss. Code. Ann. § 91-7-33 (Rev. 2021) (emphasis added).  As such, there "can be no restrictions upon the right of a contestant except that placed by the jurisdiction of this state. The right to contest a will on the ground of undue influence is a familiar right[.]" *Woodville v. Pizzati*, 119 Miss. 442, 81 So. 127, 132 (1919).

¶16.    A presumption of undue influence arises when (1) a confidential relationship existed between the testator and beneficiary, and (2) the beneficiary in the confidential relationship was actively involved in some way with preparing, procuring, or executing the will. *Smith v. Averill (In re Est. of Smith)*, 722 So. 2d 606, 611 (Miss. 1998); *Croft v. Alder*, 237 Miss. 713, 115 So. 2d 683 (1959). A confidential relationship exists when "one person is in a position to exercise dominant influence upon the other because of the latter's dependency on the former arising either from weakness of mind or body, or through trust[.]" *Foster v.*

6

***Williams (In re Est. of Laughter)***, 23 So. 3d 1055, 1063 (Miss. 2009) (alternation in original).

¶17. Here, there is no dispute that, as his spouse, Dianne had a confidential relationship with Rick before his death. Confidential relationships between spouses, however, are treated differently and are not presumed to be the product of undue influence. ***Genna v. Harrington***, 254 So. 2d 525, 528 (Miss 1971).

¶18. Rather, a presumption of undue influence usually arises in the context of a gift via a will in which "there has been some abuse of the confidential relationship, such as some involvement in the preparation of the will[,]" ***Madden v. Rhodes***, 626 So. 2d 608, 618 (Miss. 1993), or "some showing that the beneficiary under the will abused the relationship either by asserting dominance over the testator or by substituting his intent for that of the testator." ***Dent v. Roberts (In re Est. of Grantham)***, 609 So. 2d 1220, 1224 (Miss. 1992). "Suspicious circumstances surrounding the creation of the will also raise the presumption [of undue influence]." ***In re Est. of Smith***, 722 So. 2d at 612 (citing ***Pallatin v. Jones (In re Will of Fankboner)***, 638 So. 2d 493, 495 (Miss. 1994)).

> i. *Whether Dianne abused her confidential relationship through her involvement in the preparation of the will.*

¶19. Brian and Richard claim that Dianne was actively involved in the making of Rick's will because she discussed the contents of the will with him on multiple occasions and was present in the lawyer's office to discuss the terms of the will. But there is no evidence to support these claims other than the affidavits presented by the Brian and Richard.

¶20. Dianne claims her involvement with the will was severely limited. She admits that

"after Rick was diagnosed with cancer, [they] had a conversation at [their] home with no one else present in which Rick asked [her] if [she] wanted the home in Florence or any part of the radio station, and [she] told him [she] did not." Additionally, they "discussed the joint purchase of a Harbor Master boat, and [they] agreed to share the cost of the purchase and title the boat jointly with rights of survivorship."

¶21.  Dianne claims that "in 2016 and 2017, [she] was present on a few occasions with Rick meeting with attorney, R. H. Burress, III, in his Iuka office in which Rick discussed provisions in his will with his attorney."[1] She had "no knowledge of any of the various discussions or drafts." Additionally, Dianne was "not present at the time of the will's execution in Mr. Huffaker's office as Rick went to that meeting by himself." Huffaker states that Rick was alone in coming to the office to sign the will, and took the original will from the office and home. Later, under Rick's instructions, Dianne took the will to Burress's office "the next time [Dianne] was in Iuka."

> ii.  *Whether Dianne abused her confidential relationship through asserting dominance over the testator or substituting her intent for that of the testator.*

¶22.  Dianne provided her affidavit and affidavits from eight different people, all stating that they had contact with Rick near the end of his life and that he seemed mentally sharp and free from undue influence. Additionally, six of these affidavits were from long-time associates who stated that they knew Rick as someone who was self-assured and not dependent or easily influenced by others.

---

[1] In a later affidavit, Dianne claims she only attended the first meeting at Burress's office, which she did not know was going to be taking place.

8

¶23. Additionally, the will revisions do not reflect a great increase in assets to Dianne. According to Burress, the changes from the previous will to the one before this Court include: (1) all items willed to Nellie would be moved into her trust, (2) reducing the Brian's bequest from $50,000 to $1, and (3) the real property belonging to the radio station that had been left to Dianne would go to Nellie's trust, and the equivalent cash would go to Dianne. Again, these changes do not show a great increase of assets to Dianne. Rather, the biggest change in the will, the reduction of Brian's share, benefits Nellie, with the assets delivered to Nellie's trust. Moreover, it appears, without a detailed accounting that was not required by the chancery court, that Dianne correctly stated that she received "approximately $442,000.00, which is considerably less than the one-third [she] would have received had [Rick] died intestate."[2]

> iii. *Whether Brian and Richard showed enough evidence of suspicious circumstances surrounding the creation of the will to raise the presumption of undue influence.*

¶24. Brian and Richard assert that there are many "[s]uspicious circumstances surrounding the creation of the will" that should raise the presumption of undue influence. ***In re Est. of Smith***, 722 So. 2d at 612 (citing ***Pallatin***, 638 So. 2d at 495). There is no dispute that the last two pages of the will are valid and signed by Rick and the witnesses. But Brian and Richard assert that the first three pages of the will show inconsistencies that are enough to provide

---

[2] Nellie's trust, in addition to the $50,000 to $60,000 per year royalties, received a total of $1,240,000. This included the "$750,000.00 from the sale of the radio station, $160,000.00 from the sale of the Florence, Alabama house, $200,000.00 that remained in the Edwards Jones account at the time of [Rick's] death, and $130,000.00 in his personal checking account[.]"

9

a genuine question of fact. Those inconsistencies include (1) the final two pages of the will appear to have been originally attached separately from the first three, providing the suspicion that the first three pages could have been substituted, (2) the first three pages of the will provide for Rick to initial, but no initials are included on the pages, and (3) the names of Brian and Nellie are misspelled.

### 1. *Signs of Substitution*

¶25.    In support of their claims, Brian and Richard offered Grant Sperry as an expert forensic document examiner to review the authenticity of the will.  Sperry's expert report shows that, of the five-page will, pages four and five, the pages containing the only signatures, "contain pairs of staple hole perforations which are inconsistent with those on the previous three pages . . . this would indicate that pages four and five were stapled together prior to being affixed by a staple(s) to pages 1 through 3 of the Will." Additionally, pages one, two, and three had indented impressions of writings that were not present on pages four through five. Sperry concluded that "the physical evidence revealed through the forensic examinations with respect to the staple hole patterns and intended writings on [the will] indicate page substitution(s) or page addition occurred prior to the forensic examinations."

¶26.    The chancellor found this unconvincing, noting that "appellate courts have 'always condemned the use of "possible" and "could have" evidence,' such as that provided by Mr. Sperry." (quoting *Carpenter v. Nobile*, 620 So. 2d 961, 965 (Miss. 1993)). The chancellor noted that this is clearly the case here as Brian conceded this point "when he acknowledge[d] that the staple holes indicated that pages '*may* have been substituted.'" (Emphasis added.)

10

¶27.    Dianne presented the affidavits and deposition testimony of the two witnesses, Huffaker, and Lovell, and Rickman, who had acted as notary. According to the witnesses, Rick came alone with his will to Huffaker's office to be witnessed. All three stated that Rick seemed both mentally competent and sure in his decisions. Upon arrival, Rick informed them that the document he was signing was the "Last Will and Testament of Frederick Adams Biddle[.]"[3]

¶28.    During his deposition, Huffaker affirmed that it was the office's practice to scan a copy of the will upon signing and that Rick's will was no exception.[4] While Rick left with the original, Huffaker's office maintained a copy of the will on file and was able to reproduce it for the trial court. Huffaker produced his office's copy of the will and affirmed it was identical to the will before the trial court. These facts remained undisputed during the summary judgment hearing.

### 2.    *Failure to Initial When Prompted*

¶29.    Brian and Richard argue that Rick's failure to comply with the express terms of the will, i.e., his failure to initial, is enough to call into question the validity of the will. Pages one, two, and three of the will contain a section that says, "INITIAL FOR IDENTIFICATION" and then contains a blank space in which to initial. Rick did not initial

---

[3] The witness affidavits state that they "witnessed him sign the documents entitled 'Last Will and Testament of Frederick Adams Biddle,' (a copy of which is attached hereto)"; however, no such copy was attached.

[4] The witnesses were inconsistent on how the document was provided to them, i.e., whether the will was stapled or loose. It was noted, however, that to scan a copy of the will into the server, the document had to be unstapled. This could account for some of the staple holes discussed by Sperry.

any pages.

¶30.  While this Court does find it odd that a person would not initial where prompted to do so, this Court has stated that

> [a]s a general rule of law courts tend to sustain a testamentary document as having been legally executed if it is possible to do so consistent with statutory requirements.

> Ordinarily, substantial compliance with statutory formalities in the execution of a will is sufficient, in the absence of a suggestion of fraud, deception, undue influence or mental incapacity.

*Lyle v. Shannon (In re Est. of Giles)*, 228 So. 2d 594, 596 (Miss. 1969) (citation omitted). For a nonholographic will to be validity executed, statutory law dictates that it must "be signed by the testator . . . . Moreover, if not wholly written and subscribed by himself . . . , it shall be attested by two (2) or more credible witnesses in the presence of the testator . . . ." Miss. Code. Ann. § 91-5-1 (Rev. 2021).

¶31.  Brian and Richard cite *Thomas v. Thomas (In re Est. of Thomas)*, in which the Court of Appeals was presented with a will that had no initials on the first two pages, despite the testator's provision stating: "I have hereunto set my hand and placed my initials in the margins of the preceding two pages . . . ." *Thomas v. Thomas (In re Est. of Thomas)*, 122 So. 3d 111, 115 (Miss. Ct. App. 2013).  The appellate court recognized that an execution clause in the will "may be sufficient to invalidate the will[.]" *Id.* at 118. Brian and Richard, however, did not cite any authority that required such result. Rather, because the will complied with Mississippi Code Section 91-5-1, the court held that the will had been validly executed. *Id.* The lack of explanation for failure to initial despite the testator's legal

12

experience, however, was considered a factor in finding that the beneficiary did not act "in good faith in the initiation of the procurement of the will." *Id.* at 123.

¶32.  Rickman, who notarized Rick's will, stated that she did not know if it was out of character for Rick not to sign where indicated on similar documents. Similarly, Lovelace, one of the witnesses, stated only that she did not remember any discussion about initialing each page. This Court does not find a genuine dispute of fact.

### 3.  Misspelled Names

¶33.  The will misspells the middle names of both Brian, Rick's son, and Nellie, Rick's granddaughter and the main heir to Rick's estate. The will spells Brian's name as "Brian *Bains* Biddle" when it is actually Brian Baines Biddle. (Emphasis added.) The will spells Nellie's name as "Nellie *Katherine* Biddle" when it is actually Nellie Kathryn Biddle. (Emphasis added.)

¶34.  The issue of misspelled names has been brought in Mississippi before to show undue influence, but this is the first time it has appeared before this Court. *See Est. of Evans v. Taylor*, 830 So. 2d 699, 703 (Miss. Ct. App. 2002) (finding when a beneficiary hired the lawyer, instructed the lawyer on the contents of the will, and executed the will without the input of the testator, a "lack of communication and interaction is evident in that [testator's] name is misspelled four times in his own will."). No precedent holds that misspelled names alone indicate such a suspicious circumstance to raise the presumption of undue influence. As such, this Court agrees with the chancellor that this evidence is not enough to raise a genuine dispute of fact to overcome summary judgment.

## CONCLUSION

¶35.    This Court affirms the trial court's judgment.  Brian and Richard did not raise the issue of Rick's domicile until they responded to Dianne's summary judgment motion, two years after the initiation of this case. The question of proper venue and jurisdiction is time-barred. As to the issue of undue influence, this Court finds that the evidence presented did not present a genuine issue of material fact concerning the existence of suspicious circumstances rising to the level of undue influence.

¶36.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**